## BURLINGTON *vs.* SWANVILLE.

*Husband and wife. Pauper residence—how acquired and lost.*

Abandonment of a home or residence, followed by five years consecutive residence in another place, without receiving pauper supplies, will effect a settlement; but the abandonment of a husband or wife will have no such effect. No abandonment of either party by the other will, *per se*, affect the husband's settlement.

Though a wife cannot have a pauper settlement different from that of her husband, she can so. establish her residence in a town other than that in which he resides as to have her home separate from his, so that in law as well as in fact her home will not be his home.

A man's settlement may be in a town though his wife and children have resided for the five preceding years consecutively in another town, without he or they receiving pauper supplies during that period.

ON MOTION AND EXCEPTIONS.

ASSUMPSIT upon an account annexed, for the support of William Hurd from December 7, 1871, to May 1, 1872. It was not de-

Burlington *v.* Swanville.

nied that all proper statute notices and replies were given. The pauper was married in Swanville in 1839, lived there over twelve years, then went to Waldo for about three years, and returned to Swanville in 1855, where he remained till 1859, when he came to Burlington, staid there six months, then to Lowell for eighteen months, then to Lincoln for about the same length of time, and then to Enfield. His wife bore him five children, all born in Swanville. In March, 1864, Mr. Hurd left his family in Enfield, to go to work for a few weeks at Mattawamkeag Point. During his absence, and without his knowledge or consent, his wife and children moved to Lincoln, where his wife has ever since resided, the children staying with her till they married, two living with her at the time of trial. Returning from Mattawamkeag, Mr. Hurd ascertained where his family was, went there, had some talk with his wife, in which (as she testified) it was agreed that she would take care of herself and children, and he might take his money and support himself, which conversation he denied, but from that time it was admitted that he never lived with his wife nor spoke to her again, and was in Lincoln only once or twice, calling upon the children, one of whom was married and living in the other part of the house occupied by Mrs. Hurd, and contributed nothing toward the support of his family beyond giving a dollar or two to the children at the time of making these calls. Testifying in behalf of the defence, Mr. Hurd said that he always calculated that his home was where his family was, where his children were, calling them his family; that he had lived for short periods in various towns; in Lincoln a year or so, on a place for which he bargained with one Nute, where he kept house for himself; at Benj. Davis', in Burlington, in 1867–8. Being asked upon cross-examination if he made it his home at Davis' he replied : "Yes sir, had my clothes, valise and trunk there," which he afterwards explained to mean that he called it his home wherever he happened to be at work. After 1864 he voted once in Enfield, and voted in Lincoln in 1868, the year he lived on the Nute place. From 1863 to 1869 inclusive he was taxed in Lincoln, except in 1865, but paid his tax only for

1866. When one of the other taxes was demanded, he said he should not pay it there, because he had been living in Burlington, and if he paid anywhere it would be in Burlington. He was on the voting list of Lincoln from 1863 to 1871 inclusive, (except 1865,) but voted there only in 1868. The plaintiffs notified Lincoln as well as Swanville. The verdict was for the plaintiffs, which the defendants moved to set aside as against law and evidence.

The counsel for the defendants requested the following instructions :

I. If the pauper once established his residence in Lincoln, and has never since abandoned his wife or family, and no pauper supplies have been furnished, their continued residence in that town for more than five years consecutively, gave him a settlement in that town.

II. No abandonment by the wife of the husband, or refusal to cohabit with him, will affect the settlement of the husband, unless he abandoned her.

The first requested instruction the presiding justice refused to give. With reference to the second he remarked that "as matter of law the proposition is correct as it is worded, but requires careful consideration to understand its meaning. A wife can abandon her husband and divorces are often granted for that cause. She can abandon him as completely as he can abandon her. The point of inquiry is whether or not a separation has taken place, so as to create separate homes." "If they do separate, then they may have separate homes, and it is of no consequence which left the other. If she took up a separate residence it would become her dwelling-place or home to all intents and purposes, as much as if she were unmarried ; but the wife's home is not necessarily the husband's home. Under our laws, a married woman may hire a tenement, take her property into it and establish a home for herself alone, separate from her husband, just as well as if she were an unmarried woman. He has no right to control her property against her will; she can control it herself, and manage it as she pleases."

Alluding to a point urged by the defendants' counsel, that a

Burlington v. Swanville.

man may have a home in a town without having any particular place in the town where he has a right to stay or call his home, the judge ruled or remarked to the jury : "Can a man be said to have a home in a town without having some roof to shelter him, some door which will be willingly opened to him, some place where he can lie down at night, some table at which he may be permitted to eat ? Such a thing is possible. There is no legal impediment in the way. Whether such a condition of things is probable, the jury will judge. It is not impossible for a man to retain his home in a town though there is no particular spot that he has a right to go to. If, having established his residence in a town, he leaves with an intention not to return, or if he leaves without any intention one way or the other, taking all his earthly possessions with him, his residence is thereby interrupted. If he goes from town to town not having any intention one way or the other never thinking whether he will or will not go back to the town which he has left taking with him his trunk and clothing, and whatever else of earthly things he possesses, having no intention as to whether he will return or not; that will constitute an interruption. That was the precise point decided in *North Yarmouth* v. *West Gardiner*, 58 Maine, 207.

The defendants' counsel suggesting that the fact of the pauper having a wife and family in town which he had not abandoned would distinguish this case from that of *North Yarmouth* v. *West Gardiner*, the judge remarked that that fact might be important as a piece of evidence to be weighed in connection with the other evidence in the case, in determining what the pauper's intention was, but the ultimate fact to be determined after all was as to the intent with which the pauper left town.

The defendants excepted to the instructions and refusals to instruct. The foregoing are only extracts from the charge, which was full, covering all the points raised in the case.

*A. W. Paine* for the defendants.

The facts upon which our requests were based are these. The pauper Hurd having his residence and settlement in the defendant

town in 1859, being then a married man with five children, abandoned his residence in that town, moved away, and has never since returned to reside there as his home.    He first went to Burlington, and from thence to other towns in that neighborhood, gaining no settlement, but living in several places, until 1863 or 1864, when, during his absence in the woods for a few weeks, his family moved into Lincoln.    On his return soon after from the woods, he sought out their new place of residence, went to it and spent a portion of the day there, partook of a meal prepared there by his daughter, and ever after sought there to renew or continue his relation of husband and father to the family.    From time to time, during the years which succeeded, he sought in various ways to win back his family to their former state of unity, by making advances to that end in various ways, assisting by occasional gifts in their support, sending them tokens of affection, and at one time actually bargaining for a house and farm within the town, into which to remove them, and actually taking possession of it and keeping such possession for two or three years.    During all this time, however, after the removal to Lincoln, the wife of the pauper refused to cohabit with her husband, or to permit him to reside in the house, he living around in various places in Lincoln and neighboring towns, with no settled place of residence anywhere, other than that which his wife occupied, generally spending his time wherever he could get employment and a living.    During all this time too, from 1863 to 1869 inclusive, he was taxed in Lincoln, and until 1871 his name was continued on the voting lists of the town, except only in 1865, he being on the first day of April of that year absent from town on what now appears to be a temporary visit to Swanville among his old friends.    And what is important is the fact that he testifies that "he never abandoned his wife," "was always glad to see them," &c., a sentiment which was confirmed at the trial by very much testimony of his acts on both sides.

These are what may be called the undisputed facts of the case so far as questions of law arise, and they are the facts upon which were based the two requested instructions.

Burlington *v.* Swanville.

Our first proposition is so simple as to be tautological, an axiom, a truth that is self evident, and can hardly be made more so. If a person, having a wife and family, once established his home in a town and never abandons it, he continues it. Such in truth is the exact proposition submitted and refused.

If a man once establishes his home with his family in a given town, and then abandons that family, he may gain a settlement or have a home independent of them, but in order for him to gain such new home independent of them he must first give them up, or in other words abandon them, otherwise his home is with them. Such is the common sense of the proposition, and such is the uniform current of authority. These authorities when thoroughly examined will be found to concur in this, and every where in case of wandering paupers they base their whole argument upon this supposition. The other view of the case, viz., that of the man who has not abandoned his family, has never before been up for argument or decision. The doctrine now broached is *de novo.*

Thus, in that last of all cases in our state, so elaborately argued by the learned judge at all points, that of *Ripley* v. *Hebron,* 69 Maine, 379, the question of difficulty, the vexed question in all cases of the kind, is forcibly put as follows : "When a man leaves town . . . . . and is no longer personally residing there, and leaves no family nor property, &c., can he retain a home ?" and in his answer he says, "if he did not intend to abandon it as his home, but did intend to retain his connection," &c., "then the inference and conclusion is not a questionable one." See also *North Yarmouth* v. *West Gardiner,* 58 Maine, 207.

The question is whether or not a wife who, in the absence of her husband, has located a home in a given place, afterwards adopted and approved of by him, can by her own conduct and without his concurrence so act toward him as to affect his residence or settlement. Can she as the jury were told "abandon him as completely as he can her"—"as if she were unmarried ?" He can gain a settlement without her ; can she do the same ?

It is his intention that controls a settlement. If he intends

that his home shall be where hers is, can she control that intention because physically able to exclude him from the house? Her right to control her own property has nothing to do with this question. There is no such thing as a wife abandoning her husband within the meaning of the pauper act which is the connection in which this question arises, nor can she control his will as to his domicile. *Richmond* v. *Vassalboro*, 5 Maine, 396 ; *Pittston* v. *Wiscasset*, 4 Maine, 293 ; *Waterboro* v. *Newfield*, 8 Maine, 203 ; *Augusta* v. *Kingfield*, 36 Maine, 235 ; *Warren* v. *Thomaston*, 43 Maine, 606 ; *Howland* v. *Burlington*, 53 Maine, 54. As our proposition of law which was given was declared to be correct "as worded," we except to comments which virtually reversed it.

The facts do not sustain the verdict upon correct legal principles.

*Wilson & Woodard* for the plaintiffs.

The residence and acts of the wife have nothing to do with establishing the residence of the husband. *Hallowell* v. *Saco*, 5 Maine, 143 ; *Raymond* v. *Harrison*, 11 Maine, 190 ; *Greene* v. *Windham*, 13 Maine, 225 ; *Parsons* v. *Bangor*, 61 Maine, 457.

WALTON, J. In our judgment there was no ruling or instruction of the presiding judge of which the defendant can justly complain.

The first requested instruction, namely, that "if the pauper once established his residence in Lincoln, and has never since abandoned his wife or family, and no pauper supplies have been furnished, their continued residence in that town for more than five years consecutively gave him a settlement in that town"—was rightfully withheld, because it fails to discriminate between the abandonment of one's wife or family and a change of residence from one town to another. One may change his residence without abandoning his wife or family; or he may abandon his wife and family without taking up his residence in another town. Strike out the words "wife or family" and insert "residence," and strike out "their" and insert "his" and the proposition would be correct. As it is, it is clearly erroneous. *Parsons* v. *Bangor*, 61 Maine, 457.

The second requested instruction, namely, that "no abandonment by the wife of the husband, or refusal to cohabit with him, will affect the settlement of the husband unless he abandoned her," was given. But the defendants complain of the remarks of the judge which followed. They contend that they destroyed or neutralized the instruction and were therefore improper. We think not. It may be doubted whether the requested instruction is itself strictly accurate, whether the judge would not have been justified in withholding it altogether. It will be noticed that if it does not directly assert it very clearly implies, that abandonment by the wife will affect the settlement of the husband if he also abandons her. Strictly speaking no abandonment of either will, *per se*, affect the husband's settlement. Abandonment of a home or residence may affect the settlement, but the abandonment of a husband or wife will have no such effect. As remarked by the presiding judge, the real point of inquiry is whether an actual separation has taken place so as to give the husband and wife separate homes, so that while the wife actually resides in one town, the husband may have a home in another town. As worded, the requested instruction was well calculated to confuse if not to mislead the jury, and the remarks of the presiding judge were intended to guard against such a result. We think they were pertinent and proper.

But the chief ground of complaint is the instruction that a wife may abandon her husband and establish for herself a home separate from his. The question is not whether she can gain a pauper settlement separate from his. Of course she cannot. But whether she can establish for herself a separate home, so that in law as well as in fact her home will not be his home.

The defendants insist that while it is true that the husband may abandon his wife and establish for himself a separate home, she cannot abandon him and establish for herself a separate home.

We think she can. This precise argument was urged in a case recently decided in the supreme court at Washington and overruled. It was there claimed that the domicile of the husband is the domi-

cile of the wife, "that she could not have a different one from his." But the court held that she could, that this "was so well settled that it would be idle to discuss the proposition, that the rule is that she may acquire a separate domicile whenever it is necessary or proper that she should do so ; that the right springs from the necessity for its exercise, and endures as long as the necessity continues." *Cheever* v. *Wilson*, 9 Wallace, 108.

And in an early case in this state where the same argument was urged, the court held that although the residence of the wife is evidence of the domicile of the husband, yet it is not conclusive that "if he has abandoned her, or she has abandoned him, he may establish his domicile elsewhere." *Greene* v. *Windham*, 13 Maine, 225.

Of course husbands and wives are expected to live together. The marriage relation contemplates that they will do so, and that they will have but one home. But if for any cause the home of the husband becomes an unfit place for the wife to live in, or he becomes an unfit person for her to live with, the law gives her a right to leave, and to establish for herself a home elsewhere. We cannot doubt that the ruling of the presiding judge upon this point was correct.

We think the verdict is not contrary to the weight of evidence.

*Motion and exceptions overruled.*

APPLETON, C. J., DANFORTH, VIRGIN and PETERS, JJ., concurred.